# CASES

## FIRST DISTRICT

# APPELLATE COURTS OF ILLINOIS

## DURING THE YEAR 1923.

---

## Liberty Export & Import Corporation, Appellee, v. Swift & Company, Appellant.

### Gen. No. 28,361.

1. SALES—*what constitutes "shipping documents" under "c. i. f." contract of sale.* Under a "c. i. f." contract for the sale of rice to be shipped from an Asiatic port to the buyer at a Cuban port, the "shipping documents" to be mailed direct to the buyer in Cuba, the seller is bound to mail to the buyer a bill of lading, an insurance policy and a proper invoice sufficient to enable the buyer to clear the shipment through Cuban customs, and this requirement is not met by a tender, through a bank, of a delivery order for the amount of rice bought to be selected from a larger consignment, a certificate of insurance and a commercial invoice, where the evidence shows no agreement of the parties or any laws, customs or usages of Cuba modifying the customary terms of such a contract, and that without a bill of lading and a consular invoice the buyer could not clear the shipment through Cuban customs.

2. SALES—*when buyer's breach of "c. i. f." contract justified by seller's violation of terms.* A buyer's refusal to accept and pay for rice bought on a "c. i. f." contract is justified where the contract

(1)

called for shipment of a specified quantity of rice from an Asiatic port direct to the buyer at a Cuban port, payment to be made on arrival and inspection, the shipping documents to be mailed to the buyer direct at the delivery port, where the evidence shows that no rice was consigned to the buyer but that the seller tendered to it delivery of the amount from a larger consignment made indirectly to the seller, that the bags were not marked as specified by the contract, that no shipping documents were mailed direct to the buyer but, instead, documents not in compliance with the contract were tendered through a collecting bank together with a bill for charges not contemplated by the contract, and that without the customary shipping documents contemplated by the contract the buyer could not clear the amount of his purchase through the Cuban customs without clearing the whole shipment and paying all charges.

3. PLEADING—*proof of performance as alleged by seller essential to recovery of damages from buyer for breach.* In an action by the seller of goods on a "c. i. f." contract against the buyer for damages for breach by refusal to accept or pay for the goods, there can be no recovery by plaintiff where it alleged substantial performance on its part of all the terms of the contract, which required delivery direct to the buyer of the customary shipping documents contemplated by such a contract, and the evidence showed that plaintiff failed to comply with such requirement but, instead, tendered through a collecting bank other documents in lieu of the customary shipping documents, no waiver by the buyer being alleged or proven.

4. SALES—*when "c. i. f." contract not materially modified by special provision as to payment.* A provision in a "c. i. f." contract for the sale of goods, for payment by the buyer "on arrival and inspection" at the port of delivery, is not so inconsistent with or repugnant to the provision making the contract one "c. i. f." as to deprive it of that character or relieve the seller of the duty to comply with its terms as a condition precedent to holding the buyer for breach on the latter's refusal to accept and pay for the goods for a material departure by the seller from its terms.

Appeal by defendant from the Municipal Court of Chicago; the Hon. HARRY OLSON, Judge, presiding. Heard in the second division of this court for the first district at the March term, 1923. Reversed with finding of facts. Opinion filed November 27, 1923. Rehearing denied December 8, 1923. *Certiorari* denied by Supreme Court (making opinion final).

**Statement by the Court.** By this appeal defendant seeks to reverse a judgment of $22,096.04 rendered

against it on October 20, 1922, by the municipal court of Chicago, in a first-class action in assumpsit commenced on April 7, 1921.   After much evidence had been introduced by both parties the court, over objections, instructed the jury to find the issues for plaintiff, and, upon their being further orally instructed to fix the amount of plaintiff's damages, they returned a verdict in its favor in said amount.

The action is for damages by reason of the refusal of defendant to accept and pay for 100 tons of rice and is based upon a "c.i.f." contract.   The evidence discloses that the rice at one time was owned or controlled by the National Rice Mills of San Francisco, California; that prior to February 11, 1920, it was loaded on board the steamship "St. Andrew" at Hongkong, bound for Havana, Cuba; and that it was examined on February 11, 1920, by the surveyor of the port of Hongkong and duly certified to as being of fair average quality, packed in double bags and stowed in compartments fit for the voyage, etc.   The "c.i.f." contract referred to is as follows:

"No. P-0709.

SWIFT & COMPANY
   Oficios 94
      Habana, Cuba

February 12, 1920.
Messrs. Liberty Export & Import Corp.,
Aguiar 116,
Havana.
Dear Sirs:
   We confirm our purchase of yesterday:
   100 tons Siam Usual Rice #1 at $12.50 per 100#
CIF Havana.
   Large Double Bags.
   Port:  Havana.
   Via:
   Steamer:  Shipment February/March direct from Orient or cancel unless renewed by mutual consent.
   Marks:  S.A.C.

Payment: On arrival and inspection of the goods. Conditions: Mail shipping documents direct to Swift & Company, Havana.

> Swift & Company.
> Per: J. A. Ford
> 12 Feb. 1920.
> Sales Dept.
> Havana, Cuba.''

On the following day, February 13, plaintiff's Havana office transmitted a copy of this original letter to its New York office, accompanied with a letter in which it was stated:

''Please note that the contract calls for the *mailing* of shipping documents direct to Swift & Company, Habana. The conditions of payment are—on arrival and inspection of the goods. These are the usual terms given to Swift and we believe you will find them satisfactory.''

On February 17, plaintiff's New York office wrote its Havana office in reply as follows:

''We *confirm your letter of the 13th inst.* enclosing *contract* covering 100 tons of Siam Usual Rice sold to Swift & Co. *In the future* we do not care to continue doing rice business with Swift & Co. on what you call 'usual terms.' We know positively and we have right now before us three or four instances in which rice has been shipped to Cuba on sight draft against Bill of Lading. By doing business in this way Swift & Co. will have the opportunity of examining the rice at the dock upon arrival just the same as before. We want to do business this way as otherwise it will mean a very large amount outstanding until the rice is inspected.''

It thus appears that plaintiff treated defendant's letter of February 12 as the contract between the parties, and accepted the terms and conditions as therein stated. Furthermore, plaintiff's witness, Brandon, its agent in Havana, testified: ''I did not, nor did anyone in the employ of the Liberty Export & Import Corporation to my knowledge, ever write and take ex-

ceptions to any of the terms of this confirmation.''
(Letter of February 12.)

The Liberty Steel Products Company was the
parent corporation of plaintiff. The two companies
occupied the same offices in New York City, and ap-
parently used the same or similar stationery. Plain-
tiff is a New York corporation and defendant is a
West Virginia corporation with its principal office and
place of business in Chicago, Illinois. Both plaintiff
and defendant in the year 1920 were lawfully entitled
to do business in the Republic of Cuba.

The steamship ''St. Andrew'' left Hongkong (in the
Orient) on February 19, 1920, and arrived at Havana
on April 14, 1920. Her manifest, examined in Havana,
disclosed that there were in all 30 lots of rice on board,
and that the consignee and consignor of the respective
lots were named in the manifest, as were also the num-
ber of bags of rice in each lot and the marks on the
bags. Nowhere on the manifest did the names of
plaintiff or defendant appear, nor did it appear that
any of the bags in any lot were marked ''S.A.C.''
(Swift & Company). Lot No. 5 consisted of 2,679 bags
(300 tons); the consignee named was ''P. A. Xavier y
Co.'' and the consignor ''Park Union Foreign Bank-
ing Corporation''; and the bags were marked ''F. L.
Habana.'' Lots 6, 7 and 8 each consisted of 893 bags
(100 tons) and the respective consignees and con-
signors, and the marks on the bags, were the same as
lot No. 5. Sometime during the month of April, 1920,
the price of rice began to decline, and continued to
decline during April and during the remaining months
of the year 1920. On April 29, 1920 (fifteen days after
the boat had arrived at Havana), plaintiff's New
York office wrote defendant at Havana, inclosing a
*commercial* invoice. The letter and invoice are as fol-
lows:

''We take pleasure in advising you that we have
shipped to you per S.S. 'St. Andrew' your order for
893 sacks of rice, 'Siam Usual No. 1,' as per commer-

6    APPELLATE COURTS OF ILLINOIS.

Liberty Export & Import Corp. v. Swift & Co., 231 Ill. App. 1.

cial invoice hereto attached, which we trust will be satisfactory to you. The original documents have been forwarded through our bankers and we have drawn for the amount of this shipment as agreed upon. We hope that this shipment will reach your hands in good condition and that you will honor our draft upon presentation.

(Signed) Liberty Export & Import Corp.
Cuban Division.''

"Liberty Steel Products Company

Marks:  F. L. Havana.              Invoice No. C. N.-82
New York, April 29, 1920

Invoice of Mdse. shipped per S.S. 'St. Andrew'
Bound for Havana, Cuba, consigned to or-
der of Liberty Export & Import Corp.

For account *and risk* of Swift & Co., Ha-
vana, Cuba.

Your order No.................
Our order No. C. N.-60.
Bill of Lading Dated........... Terms:
Sight Draft.

| Gross Weight. | Description |
| --- | --- |
| 200032# | 893 sacks, each 224 lbs. gross, Rice, Siam Usual No. 1 200032 lbs. at $12.50 per 100 lbs. C. I. F. Havana ............... $25,004.00 Banking commission, ⅜% ..... 93.76 |

$25,097.76

E. & O. E.
LIBERTY EXPORT & IMPORT CORP.
by (sig.) Thomas Mendez.''

On the same day, April 29, and before defendant had received the above letter and invoice, defendant, per J. A. Ford, from its Havana office, wrote plaintiff's Havana office as follows:

*"Our Order No. 709.*

"The above order calls for Siam Usual Rice to be shipped direct from Orient February/March.

"We hereby notify you that, if these terms have not

been complied with, we will refuse to receive merchandise.    Kindly acknowledge receipt and oblige.''

The shipping documents for the 2,679 bags of rice (lot No. 5) evidently arrived at San Francisco prior to April 10, 1920, for on that day the First National Bank of that city wrote the Royal Bank of Canada at Havana as follows:

''We enclose herewith two negotiable copies of bill of lading covering 2,679 bags of rice, *Consular* invoice and Union Insurance Society's certificate issued for $78,540, covering the same lot of 2,679 bags of rice per S. S. St. Andrew.    We would ask that you kindly, through a reputable brokerage house, deliver these documents to the Steamship Company, so as to enable said company to honor our client's, National Rice Mills, *delivery order,* #1043, in favor of the New York Pacific Commercial Company for 893 bags, #1044 in favor of the Liberty Steel Products Corporation for 893 bags, and #1045 also for 893 bags in favor of the Liberty Steel Products Corporation.    All of the costs and your charges relative to this transaction will be, of course, for account of our clients.''

On the same day, April 10, National Rice Mills made out a bill and wrote a letter, both addressed to the Liberty Steel Products Corporation at New York City, as follows:

''Sold to Liberty Steel Products Corporation * * * Ex. S. S. 'St. Andrew,' Routing Hongkong to Havana, Terms Sight Draft/Documents, Invoice No. 1301, Contract No. 487.    893 Bags No. 1 Siam Usual Rice, 200,032 lbs. at $12 per 100 lbs., c. i. f., Havana, In Bond                                    $24,003.84
Papers attached:

Delivery order #1045; Letter (First National Bank) re Bill of Lading; Consular invoice and insurance certificate; Copy Hongkong certificate; British & Foreign Marine Ins. Co. Policy, $220.''

                    ''Liberty Steel Products Corporation.

''This is to advise you that Canton Insurance Policy, No. 20—101728, covering marine and war risk insurance, *with average in the sum of $78,540,* cover-

ing 2,679 bags of rice, S. S. St. Andrew, Hongkong to Havana, Cuba, has been forwarded to the Royal Bank of Canada, Havana, per letter of acknowledgment, First National Bank of San Francisco herewith. *We* hereby *guarantee* that 893 bags, our delivery order No. 1044, are covered under said policy *in the sum of $26,180*.

(Signed) National Rice Mills.''

Although these last-mentioned instruments would in the ordinary course of mail have reached plaintiff's New York office about April 16, it was not until May 4, 1920, apparently, that plaintiff took any steps to have the draft (mentioned in its said letter of April 29 to defendant) presented to defendant at Havana for the amount claimed to be due for the 893 bags of rice, together with documents. What was the cause of the delay does not appear. On that day, May 4, plaintiff, at New York, wrote the Irving National Bank of that city, for the attention of its foreign collection department, as follows:

''We are enclosing herewith the following draft, which we would thank you to discount, crediting proceeds to our account, duly advising us.

''No. 204 at sight on Swift & Company, Havana, Cuba, $25,097.76 covering a shipment of 893 sacks of Rice per the S/S St. Andrew, from Hongkong to Havana.

''Documents consist of commercial invoice CN-82 in original and duplicate; original and duplicate delivery order on the Dodwell Line of Steamers, calling for delivery of 893 bags of Rice; letter from the National Rice Mills, San Francisco, covering insurance; Hongkong certificate of inspection; original and duplicate insurance certificates from the British & Foreign Marine Insurance Company, and letter from the First National Bank of San Francisco, advising of instructions having been given to the Royal Bank of Canada to honor delivery orders against this cargo. We trust you will find all these documents in order.''

On May 12, 1920, the Royal Bank of Canada, at Havana, presented to defendant, at its Havana office,

the draft for $25,097.76, together with the commercial invoice and a delivery order, and demanded payment of the draft in exchange for the delivery order. Defendant refused to pay the draft. It was several times thereafter presented and each time payment was refused. On one occasion the amount demanded was increased by the sum of $1,527, and on another an additional increase of $1,490.33 was asked. On July 24, 1920, the draft was protested by plaintiff. The said delivery order is as follows:

"Original                                         No. 1045
　　　　　　San Francisco, Cal., April 10, 1920.
To Dodwell Line of Steamers:

"Please deliver to the Liberty Steel Products Corporation or order the following merchandise, viz., Marks, F. L. Havana, 893 bags and contents:

No. 1, Siam Usual White Rice, 224 lbs. gross; Ex. B/L #5; Dodwell Line Steamer St. Andrew; B/L dated 1/31/20. Freight prepaid to Havana, Cuba.

　　　　　　　　　　(Signed) National Rice Mills."

(Endorsed on back by Liberty Steel Products Company, by F. C. Lord, comptroller, and by plaintiff, by F. C. Lord, vice-president.)

No bill of lading or policy of insurance for the 893 bags of rice was tendered to defendant. William Thomsen, plaintiff's witness, connected with the Royal Bank of Canada at Havana as assistant manager of its collection department, testified: "There was never, to my knowledge, a bill of lading for 100 tons or 893 bags of rice ever presented to Swift & Company in connection with the draft in question." J. A. Ford, defendant's witness and who, from about May 1, 1920 to September 1, 1920, had charge in Havana of defendant's rice contracts, and to whom plaintiff's said draft on defendant was presented several times, testified by deposition:

"No bill of lading was ever presented by the bank. There could not have been one for the quantity of rice ordered by Swift & Co. * * * The shipment in which was included the 100 tons for Swift & Co., or

were billed against Swift & Co., was for a greater quantity than 100 tons, and, in accordance with the customhouse laws of Cuba, it (the shipment) would have had to be cleared altogether on one bill of lading for this larger quantity. * * * All the rice was bought by Havana in one way only, i. e., direct shipment from the Orient, naming a certain time limit, c.i.f. Havana, and unless I received with the draft the documents corresponding to this (which should have been a *consular* invoice for the quantity of rice ordered and an *original* insurance certificate, all in the name of Swift & Co.), I refused to accept the shipment and there were many of them of this kind. Referring to this draft, no bill of lading was ever presented by the Royal Bank of Canada, or any person, with it. No insurance policy or certificate was ever presented for the specific quantity ordered. * * * I never promised to pay the draft. * * * I recollect an occasion when Swift & Co. accepted a delivery order *instead* of a bill of lading with disastrous results; * * * after we finally got possession of the local delivery order, which is the only one that is of value, we found that the other importers, whose rice was included in the shipment, through influences or whatever way, had withdrawn all the good rice, leaving the damaged rice for Swift & Co.; we lost over $10,000 on that shipment; that was due to getting damaged rice because in similar cases no particular portions of rice are assigned to the importer, and first come—first served. * * * The draft was originally drawn for $25,097.76—for more than the quantity of rice specified. I would not pay the draft with a collection charge on banker's commission added to the face of the draft. No other draft but this one was ever presented. * * * The bank demanded a larger sum than the face of the draft. The additional amount is written here on the draft. First of all the amount was $1,527.49 more than the original amount drawn. The date that was demanded would be about May 27th. * * * I absolutely refused on all occasions when this draft was presented to receive and pay for it and accept any documents thereto attached. * * * The reasons I refused to

pay the draft and take up the documents were, first, because of past disastrous experiences with a delivery order, such as the one that was attached to the draft, second, because we did not receive the customary documents, viz., consular invoice, bill of lading and original insurance certificate for 100 tons Siam Usual rice shipped from the Orient, February to March, direct to Havana, the bags marked 'S.A.C.' The documents which were tendered did not show that the bags were marked 'S.A.C.' * * * I don't remember ever having made any inspection of the rice on the docks. * * * The rice cleared through the customhouse probably two or three days before May 27, 1920.''

Henry P. Fritot, defendant's witness and a rice broker at Havana, testified by deposition:

''There was no custom or usage in Havana in 1920 that, under a C.I.F. contract of purchase and sale from a foreign port to Havana, the seller could tender the buyer a delivery order in lieu of a bill of lading. There was no custom in Havana in 1920, under such a C.I.F. contract, where a seller would deposit a draft in a foreign bank for collection and such foreign bank would send it to a bank in Havana, that the buyer was bound to pay a banker's charge or banker's commission. Buyers here have always refused to pay this charge. * * * The customhouse in Havana will not deliver goods which arrive on a ship from a foreign port on a delivery order. A bill of lading must be presented. If the bill of lading called for 300 tons of rice, the customhouse would not deliver 100 tons of rice on a delivery order. In regard to a shipment coming in with a bill of lading for the entire amount for several consignees, the whole lot must be cleared through the customhouse by the party presenting the bill of lading.''

George S. Younie, defendant's witness and manager for Armour & Company at Havana since 1909, testified by deposition to the same effect. He further testified on cross-examination:

''With the permission of the customhouse officials, goods can be sold subject to inspection under a c.i.f. contract. * * * I have not found c.i.f. contracts to

12        APPELLATE COURTS OF ILLINOIS.

Liberty Export & Import Corp. v. Swift & Co., 231 Ill. App. 1.

be contradictory to the idea of inspection.   *   *   *
My opinion is that terms of payment always should be
specified in a c.i.f. contract.   If goods were sold c.i.f.,
without any specification as to payment, I would un-
derstand they were to be paid for upon presentation
of the proper shipping documents.   *   *   *   Payment
would not be made upon presentation and delivery of
the goods themselves without the documents.   *   *   *
I have seen many contracts, termed c.i.f., in which
there are additional clauses, such as 'payment on ar-
rival and inspection of goods' or 'subject to inspection
by purchaser of goods on arrival,' and while I would
not consider that commercially they were straight c.i.f.
business, yet it is done on many occasions.''

Dr. Lliteras and Dr. Cueto, defendant's witnesses
and both having practiced law for many years in
Havana, testified by deposition to the effect that there
was no custom or usage in Cuba that allowed a seller
under a c.i.f. contract to tender the purchaser a deliv-
ery order for the goods purchased in lieu of a bill of
lading, or which allowed the seller to include in the
draft, in addition to the amount of the invoice for the
goods, a banker's commission, which the buyer should
pay.   James W. Beck, defendant's witness and a cus-
tomhouse broker at Havana and familiar for many
years with the rules and regulations of said custom-
house, testified by deposition that, in the manifest of
the steamship "St. Andrew," the first column referred
to the number of the bill of lading of each lot or ship-
ment, called "partido"; that a separate bill of lading
was required for each "partido"; that there was one
bill of lading for "partido" #5 for 2,679 bags; that
a delivery order for 893 bags out of the 2,679 bags
could not be presented at the customhouse and the
party presenting it got 893 bags; and that if said
party had, in addition to a delivery order, a bill of
lading for "partido" #5, he could not get 893 bags
without paying the duties and charges, and clearing
the entire lot of 2,679 bags.

It further appears from evidence introduced by

plaintiff that on June 30, 1920, defendant's Havana office, per J. A. Ford, wrote a letter to its principal office in Chicago, regarding the rice in question, in which it was stated that the 100 tons "came forward with rice to the order of other parties and had been cleared through the customhouse by a local bank and delivery order sent to us along with the draft," and that "we have, up to the present time, refused to pay same, taking the stand that we are unable to verify fulfillment of the contract as no documents were attached to the draft;" that on August 4, 1920, defendant's Chicago office wrote plaintiff at New York, calling attention to the letter of defendant's Havana office of April 29, above mentioned; that on August 11, plaintiff's New York office, by "Arthur E. Lee, general manager," telegraphed defendant at Chicago in reply, confirming the telegram by letter of the same date, as follows: "We shipped goods in accordance with said order No. 709; no record of cancellation April 29th; neither could we accept cancellation after shipment made; please instruct your Havana office to make immediate settlement for this merchandise or will be compelled to take legal action;" that later in the month of August, 1920, said Lee went to Havana to "investigate" matters, called at defendant's Havana office, had various conversations with a representative of defendant, also with defendant's attorney in Havana, respecting the "contract," and demanded a settlement, which was refused; that thereafter Lee procured possession of the rice in question from Messrs. Galvan Lobo & Company (consignees of the steamship St. Andrew) by making use of said delivery order, No. 1045, paid out various sums of money for various charges, including wharfing charges, and caused the rice to be placed in a storage warehouse in Havana; and that thereafter he made efforts to sell the rice, found it difficult so to do because of the falling market and other conditions, but finally on December

18, 1920, succeeded in selling the rice to a commission agent, named Juan Hill, at 6¼ cents per pound, with a discount of 2 per cent for cash, and realizing the sum of $11,818, less said discount, or the net sum of $11,-581.64.

Plaintiff's attorney on the trial took the position that plaintiff had substantially performed all the terms and conditions of the contract by it to be performed and was entitled to damages because of defendant's refusal to perform its part. This position was in accordance with the allegations of plaintiff's statement of claim, as amended, wherein it pleaded the performance of the contract on its part, and did not allege any waiver by defendant of any of said terms and conditions. In paragraphs 9 and 10 of its lengthy statement of claim it alleged in substance that on May 4, 1920, at New York City, it prepared the said draft for $25,097.76, in due form, sent it for collection to the Royal Bank of Canada at Havana, and at the same time sent to said bank "*all the shipping documents,* together with other papers, as were then required by the laws, customs and usages of trade and commerce then in force and prevailing in the Republic of Cuba, as hereinabove set forth, which shipping documents had all been theretofore correctly prepared covering said shipment of rice, with the request that the draft be presented to said defendant at Havana, together with all of said papers and documents;" that said draft, papers and shipping documents "were all presented" to defendant at its office in Havana on or before May 15, 1920, at which time the said rice had arrived and was in the port of Havana; but that defendant refused to pay the said draft, or any part thereof, and to take up said shipping documents and other papers.

As to the damages claimed, plaintiff alleged in its statement of claim that "on account of the procrastination, postponement and refusals of defendant to

fulfill the obligations of said contract," it was compelled to and did incur certain necessary expenses (itemized); and that there was due plaintiff from defendant at the time of the commencement of the action, April 7, 1921, the total sum of $20,522.83, figured as follows:

| | |
|---|---|
| 100 tons of rice @ $12.50 per 100 lbs. | $25,000.00 |
| Banker's commission | 93.76 |
| Interest on $25,000 at 6% per annum, lawful rate in Cuba, from May 15, 1920 (date rice was ready for delivery) to December 18, 1920 (date rice was sold) | 887.50 |
| Interest on $25,000, less $11,818, being $13,182, at 6% per annum from December 18, 1920 to April 6, 1921 | 237.27 |
| Costs, charges, fees and expenses paid | 6,122.30 |
| | $32,340.83 |
| Less amount rec'd from sale of rice | $11,818.00 |
| Total amount due | $20,522.83 |

In the statement of claim were itemized the various sums included in said item of "costs, charges, fees and expenses paid," as follows: Import duties, $1,168.76; freight and insurance en voyage, $317.57; customhouse broker's commission, $37.16; insurance to September 10, 1920, $50; insurance to October 10, 1920, $50; wharfage, as charged by the customhouse in Havana, $3,366.23; hauling rice to warehouse, $74.41; storage in warehouse from September 13 to December 31, 1920, $722.68; handling and delivering goods at warehouse when finally sold, $107.16; insurance from October 10 to January 10, 1921, $99.11, and various smaller amounts for interest, notarial fees, etc. Plaintiff on the trial introduced some evidence, as to its damages, costs, expenses, etc., and it is probable that the jury in assessing plaintiff's damages included in their verdict ($22,096.04) substantially all of the items of interest, charges and expenses, as claimed,

and added to the amount claimed to be due on April 6, 1921, interest up to the time of the trial in October, 1922.

Defendant's attorney at the conclusion of plaintiff's evidence, and again at the close of all the evidence, moved for a directed verdict in defendant's favor, but the motions were severally denied.

ROBERT C. McMANUS, JAMES M. SHEEAN, FRANK L. HORTON and WILLIAM N. STRACK, for appellant.

WORTH E. CAYLOR, for appellee.

MR. PRESIDING JUSTICE GRIDLEY delivered the opinion of the court.

The contract between the parties of February 12, 1920, on which the present action is based, is what is known as a ''c.i.f.'' contract (cost, insurance and freight). By the decided weight of authority in England and in the United States, the rule is that a contract of sale of goods on ''c.i.f.'' terms is to be executed by the delivery to the buyer of certain documents, viz., a bill of lading, an insurance policy and an invoice (sometimes a *consular* invoice, when required by the customs' regulations of the port of entry as apparently was the case at Havana, Cuba, in 1920.) Many years ago in England in the case of *Ireland v. Livingston,* L. R. 5 H. L. 395, Lord Blackburn stated what was meant by a contract of sale on ''c.i.f.'' terms. A portion of his opinion is quoted with approval in the case of *Staackman, Horschitz' & Co. v. Cary,* 197 Ill. App. 601, 605, as follows:

''The terms at a price to cover cost, freight and insurance, payment by acceptance on receiving shipping documents, are very usual and are perfectly understood in practice. The invoice is made out debiting the consignee with the agreed price (or the actual cost and commission, with the premiums of insurance, and the freight, as the case may be), and giving him credit for the amount of the freight which he will have to pay to the shipowner on actual delivery, and for the

balance a draft is drawn on the consignee which he is bound to accept (if the shipment be in conformity with his contract) on having handed to him the charter party, bill of lading and policy of insurance. Should the ship arrive with the goods on board he will have to pay the freight, which will make up the amount he has engaged to pay. Should the goods not be delivered in consequence of a peril of the sea, he is not called on to pay the freight, and he will recover the amount of his interest in the goods under the policy. If the nondelivery is in consequence of some misconduct on the part of the master or mariners, not covered by the policy, he will recover it from the shipowner. In substance, therefore, the consignee pays, though in a different manner, the same price as if the goods had been bought and shipped to him in the ordinary way."

In the case of *Harper v. Hochstim*, 278 Fed. 102, decided by the U. S. Court of Appeals for the Second Circuit in December, 1921, it is said (p. 103):

"If that contract is for what is now widely known as a 'sale c.i.f.,' such sale was by specific agreement to be accomplished or executed by the delivery of documents by vendor to vendee, and not by the physical delivery of the actual goods for which the documents are the evidence of title. The bargain must be kept as made; the buyer can no more refuse the documents and ask for the goods than can the seller withhold the documents and tender the goods; and the documents necessary are a bill of lading and policy of insurance, although additional papers, especially an invoice, are usual. The foregoing is now too well settled to need more than reference to *Thames & M. Marine Ins. Co. v. United States*, 237 U. S. 19, 26, and cases there cited."

In the *Thames* case (237 U. S. 19) it is said (p. 26):

"It is true that the bills of lading represent the goods, but the business of exporting requires not only the contract of carriage, but appropriate provision for indemnity against marine risks during the voyage. The policy of insurance is universally recognized as one of the ordinary 'shipping documents.' Thus,

18      Appellate Courts of Illinois.

Liberty Export & Import Corp. v. Swift & Co., 231 Ill. App. 1.

when payment is to be made in exchange for such documents, they are held to include not only a proper bill of lading, but also a 'policy of insurance for the proper amount.' *Tamvaco v. Lucas,* 1 Best & S. 185, 197, 206. It is not sufficient to tender the bill of lading without the policy. Benjamin on Sales, sec. 590, note; *Hickox v. Adams,* 34 L. T. (N. S.) 404. The requirements of exportation are reflected in the familiar 'c.i.f.' contract (that is, at a price to cover cost, insurance and freight), which has 'its recognized legal incidents, one of which is that the shipper fulfills his obligation when he has put the cargo on board and forwarded to the purchaser a bill of lading and policy of insurance with a credit note for the freight, as explained by Lord Blackburn in *Ireland v. Livingston,* L. R. 5 H. L. 395, 406'; *Ströms Bruks Aktie Bolag v. Hutchison,* [1905] A. C. 515, 528. See also, *Mee v. McNider,* 109 N. Y. 500.''

In the English case of *Diamond Alkali Export Corporation v. Bourgeois,* L. R. [1921] 3 K. B. 443, plaintiff agreed to sell to Bourgeois of London, England, 50 tons of soda ash for September-October shipment from American seaboard at $4.70 per hundred pounds ''c.i.f. Gothenburg.'' The terms of payment were cash against documents under confirmed banker's credit at London. Under this contract the seller tendered, with an invoice for the goods: (a) a document purporting to be a bill of lading in the following form: ''Received in apparent good order and condition from D. A. Horan to be transported by the S. S. Anglia, now lying in the port of Philadelphia and bound for Gothenburg, Sweden, with liberty to call at any port or ports in or out of the customary route, or, failing shipment by said steamer, in and upon a following steamer, 280 bags Dense soda''; and also tendered (b) a certificate of insurance issued by an insurance company of San Francisco, California, which, as the certificate stated, ''represents and takes the place of the policy and conveys all the rights of the original policyholder (for the purpose of collecting any loss or

claims) as fully as if the property was covered by a special policy direct to the holder of this certificate.'' It was *held* that the buyer was entitled to reject upon the ground that proper documents had not been tendered by the seller in conformity with the contract, and upon the grounds, in substance, that document (a) was not a bill of lading, and that document (b) was not a policy of insurance, within the purview of a "c.i.f." contract of sale. In the opinion of McCardie, J., it is said (p. 448):

"The contract decides the rights of the buyer. The question is not as to the meaning of the phrase in a particular Act of Parliament or as to the possible meaning under other forms of contract. Nor is it material that a buyer objects to the document for ulterior motives: See, for example, Lord Cairns' judgment in *Bowes v. Shand* (2 App. Cas. 455, 465, 476), and Lord Hatherley's judgment in the same case. A buyer, as these noble lords pointed out, is entitled to insist on the letter of his rights. As Lord Hatherley said: 'If you seek to fasten upon him the engagement, you must first bring him—the buyer—within the four corners of the contract.' A buyer, moreover, may have obvious business reasons for so insisting, as he may have to implement his own bargain with rigorous subvendees. Now I consider that the phrase 'bill of lading' as used with respect to a c.i.f. contract means a bill of lading in the sense established by a long line of legal decisions. Unless this meaning be given the matter is thrown into confusion." (p. 454): "Is this certificate a proper policy of insurance within the c.i.f. contract here made? * * * In all the cases a 'policy of insurance' is mentioned as an essential document. The law is settled and established. * * * I ventured in *Manbre Saccharine Co. v. Corn Products Co.*, [1919] 1 K. B. 198, to discuss the relevant authorities, including the lucid judgment of Atkin, J., in *C. Groom, Ltd. v. Barber*, [1915] 1 K. B. 316 —a judgment which I have again most carefully read. It seems plain that a mere written statement by the

sellers that they hold the buyers covered by insurance in respect of a specified policy of insurance is not itself a policy of insurance within a c.i.f. contract: See the *Manbre Saccharine* case. It seems plain also that a broker's cover note or an ordinary certificate of insurance are not adequate agreements within such a contract: See Bailhache, J., in *Wilson, Holgate & Co. v. Belgian Grain & Produce Co.*, [1920] 2 K. B. 1, 7.''

In the above-mentioned *Manbre Saccharine Co.* case, also reported in 88 L. J. K. B. (1919) 402, plaintiff, the buyer, sued for damages for breach of a c.i.f. contract to deliver certain goods and recovered a judgment. It was *held* that the buyer under such a contract was legally entitled to demand a policy of insurance which covered, *and covered only*, the goods mentioned in the bill of lading and invoice, and that, where the seller sent with the shipping documents a *letter* stating, ''We hereby hold you covered by insurance for the amount of 4,322 pounds sterling, in accordance with the terms of policy of insurance in our possession *re* shipment Ex. S. S. Algonquin,'' the seller had not fulfilled his obligation under the contract. McCardie, J., said (p. 406):

''In my opinion a purchaser under a c.i.f. contract is entitled to demand, as a matter of law, a policy of insurance which covers, and covers only, the goods mentioned in the bills of lading and invoices. This, I think, was settled by the decision of the Court of Appeal * * * in the case of *Hickox v. Adams* (34 L. T., N. S. 404). Unless the purchaser gets a policy limited to his own interests he would become only one of those who are interested in the insurance, and he is entitled, in my view, to refuse to occupy a position which may give rise to obvious complications. See, per Turner, L. J., in *Ralli v. Universal Marine Ins. Co.* (31 L. J. Ch. 318; 4 De G., F. & J. 15). I should have dealt with the above points in a few words only, but for the fact that counsel for the defendants boldly and vigorously argued that a vendor's duty under a c.i.f. contract, whatever it may have been in former times,

had been modified by recent practice amongst insurance men. It may be that the requirements of a c.i.f. contract can be altered by generally established custom. For, inasmuch as the meaning of such a contract was created by custom, it may likewise, I presume, be altered by custom. But the evidence of a modifying custom must be clear indeed ere the well-known incidents of such a bargain as a c.i.f. contract can be changed.''

In the above-mentioned *Wilson, Holgate & Co.* case (also reported in 89 L. J. K. B., 1920, p. 300), plaintiffs sued for the price of, or, alternatively, for damages for the nonacceptance by defendants of 300 tons of Brazilian manioc starch. By the contract in writing plaintiffs sold the starch at 105 pounds sterling per ton, ''c.i.f. Havre,'' to be shipped from Brazil November-December, 1918, ''and/or January, 1919,'' payment ''net cash in London against shipping documents,'' *on arrival* of goods at port of discharge. (In the contract in the present case one of the provisions is ''Payment: On arrival and inspection of the goods.'') On February 3, 1919, the starch arrived at Havre, and on February 5 plaintiffs tendered to defendants shipping documents and claimed the price. Defendants, however, refused to pay on the ground, *inter alia,* that the documents were not in order, as they did not include a policy of insurance on the goods, but instead a broker's cover note or certificate of insurance. In giving judgment for defendants, Bailhache, J., in his opinion, said (pp. 300-1):

''I am about to deliver a judgment which  *  *  * I am almost ashamed to deliver, because I am going to give effect to an objection so technical that I think commercial men might well complain that effect is given to it in a commercial court. But, to my mind, I am bound to do it.  *  *  * The only question for my decision is whether there was an effective legal tender of the documents to the defendants. It has been settled for nearly fifty years that under a c.i.f. contract the documents which must be tendered are a

bill of lading, an invoice and a policy of insurance. That was laid down in *Ireland v. Livingston* in 1872. In the present case evidence has been given that it is the common practice, nowadays, instead of tendering a policy of insurance, to tender a broker's cover-note or a certificate of insurance. A certificate of insurance is usually, but not always, used in a case where the seller has an open or a floating policy upon other goods or goods to a larger extent than those which are the subject-matter of the sale, and a certificate of insurance is used to show that the goods, the subject-matter of a particular sale, are covered by an open or a floating policy for a larger amount. The evidence is that these brokers' cover-notes and the certificates of insurance as issued by brokers in this country are constantly accepted by buyers and taken by them in place of policies of insurance. * * * I am not satisfied that any custom has arisen since *Ireland v. Livingston* was decided, which obviates the necessity for a seller tendering a policy of insurance if the buyer requires it. There are obvious differences between the buyer's position under a policy of insurance and his position under a broker's cover-note or a certificate of insurance. * * * Under a policy of insurance, which deals, as it should do, with the buyer's own contractual goods, and with nobody else's, a buyer has a direct right of action under the underwriters to the policy. Under a broker's cover-note he has no right of action, so far as I can see, against anybody. * * * The same thing applies to the certificate of insurance. * * * In my judgment, it has not been proved to me that the buyer was bound to take under a c.i.f. contract anything other than a policy of insurance relating to the goods which are the subject-matter of his own contract of sale, and not to any other goods at all.''

In the case of *Orient Co., Ltd. v. Brekke & Howlid,* [1913] 1 K. B. 531, also reported in 82 L. J. K. B. (1913), p. 427, plaintiffs agreed to sell to defendants 20 cases of French walnuts, ''c.i.f. to Hull,'' on the terms ''30 days net.'' The walnuts were shipped un-

der a bill of lading, which was sent together with an invoice to defendants, but plaintiffs did not tender to defendants a policy of insurance. They had not in fact effected any insurance on the goods, which finally arrived at Hull, though sometime after the date at which in the ordinary course they would have arrived. Defendants refused to accept them because no insurance policy was tendered with the documents, and plaintiffs sued to recover the agreed price, and judgment was rendered in their favor in the trial court. On appeal this judgment was reversed and judgment in favor of defendants entered. Plaintiffs argued in substance that, the goods having arrived safely, the facts that they were not insured against the perils of the sea, etc., and a policy not tendered to defendants with the shipping documents, were immaterial and of no importance, but the Appellate Court *held* that the goods had not been delivered in accordance with the ''c.i.f.'' contract and that plaintiffs could not recover. Lush, J., said (p. 430): ''I have come to the conclusion * * * that the plaintiffs have never discharged the obligation which was upon them of proving the complete delivery of the goods, the proof of which was essential to their success in the maintenance of this action.'' (Citing and discussing the decision in the case of *Biddell Bros. v. E. Clemens Horst Co.,* [1911] 1 K. B. 214, reversed in the Court of Appeal, [1911] 1 K. B. 934, but restored in the House of Lords, [1912] A. C. 18.)

In the English case of *Re Denbigh, Cowan & Co. and R. Atcherley & Co.,* decided by the Court of Appeals in 1921, and reported in 125 Law Times Reports, New Series, at page 388, the judgment of Rowlatt, J., in the lower court in favor of the sellers was reversed. By the ''c.i.f.'' contract between the parties the sellers sold to the buyers certain tapioca to be shipped at Java for Liverpool, ''to be taken on c.i.f. terms, net landing weights, war risk included.'' It was provided

in clause 5 of the contract: "Payment cash (before delivery, if required) against documents *or delivery order,* less usual rebate, but not later than arrival of vessel or vessels." When the tapioca arrived in Liverpool the sellers tendered to the buyers a delivery order, but no insurance policy, and the buyers refused to take delivery of the goods without a policy of insurance, contending that, the contract being on "c.i.f." terms, they were accordingly entitled to a policy as well as a delivery order. It appears from the several opinions of the three judges that the court held in substance (a) that the usual documents required by a "c.i.f." contract are a bill of lading, a policy of insurance and an invoice; (b) that when the parties agree that goods are to be taken on "c.i.f." terms, if it is desired to substitute something different the intention must be expressed in clear language; (c) that a delivery order cannot be tendered in lieu of any of the usual documents except by express stipulation to that effect in the contract; (d) even though the parties incorporate in their contract a specific provision that payment is to be made "against documents or delivery order," the sellers, if they tender a delivery order, must tender also a policy of insurance and an invoice; and (e) that, no policy of insurance on the tapioca having been tendered, the buyers were entitled to refuse to take delivery thereof.

In the present case, by the "c.i.f." contract of February 12, 1920, the defendant did not agree that it would accept any delivery order for the rice in lieu of the usual bill of lading, or that it would accept any letter of guaranty as to the insurance, or insurance certificate, in lieu of the usual policy of insurance; and plaintiff did not tender either a bill of lading or an insurance policy for the particular 100 tons of rice contracted to be sold to defendant. Furthermore, it does not appear that the bags containing the rice were marked "S.A.C." (Swift & Company) or that the

shipping documents were mailed "direct to Swift & Company, Havana," as provided in the contract. And while it appears that a *commercial* invoice for the rice, at the price agreed upon (to which was added an amount for a banker's commission), was tendered to defendant, it does not appear that a so-called "consular" invoice was tendered, as provided by article 98 of the Customs Regulations for ports in the Island of Cuba, introduced in evidence, the possession of which invoice, in addition to a bill of lading or delivery order, was necessary to "clear" the goods.

In view of the above-mentioned authorities in England and in this country, and it appearing that the law in the Republic of Cuba relative to "c.i.f." contracts is in substantial accord therewith, and in view of the facts of the present case, as outlined in the above statement of facts, we are of the opinion that defendant was fully justified in its refusal to pay the draft or accept the documents tendered or accept delivery of the 100 tons of rice, and that plaintiff, not having performed the conditions of the said "c.i.f." contract on its part to be performed, cannot recover any damages from defendant in this action because of such refusal.   Furthermore, plaintiff, in its statement of claim, pleaded substantial performance of the conditions of the contract on its part and did not allege a waiver of any of them by defendant, and in such case it is the general law that a plaintiff must prove such performance or an offer to properly perform before he can recover damages.  (Gould's Pl., 5th Ed., p. 67; 2 Encyc. Pl. & Pr. p. 999; *Songer v. Lynch,* 72 Ill. 498, 499; *Expanded Metal Fireproofing Co. v. Boyce,* 233 Ill. 284, 287, 289; *Walsh v. North American Cold Storage Co.,* 260 Ill. 322, 331.)

Counsel for plaintiff here contends in substance that the contract of February 12, 1920, should not be construed as a "c.i.f." contract, because the words "Payment: *On arrival and inspection* of the goods,"

are inconsistent and repugnant to the words "We confirm our purchase of yesterday: 100 tons Siam Usual Rice #1 at $12.50 per 100#, c.i.f. Havana." We are unable to agree with the contention. (*Harper v. Hochstim*, 278 Fed. 102, above cited; *Orient Co., Ltd. v. Brekke & Howlid*, 82 L. J. K. B., 1913, p. 427, above cited; *Arnhold Karberg & Co. v. Blythe, Green, Jourdain & Co.* [1916], 1 K. B. 495, also reported in 85 L. J. K. B., 1916, p. 665.) In the *Harper* case it appears that Ralph Harper & Company, a copartnership at Tientsin, China, entered into a written contract at New York in February, 1920, with Hochstim & Bossak, a copartnership at New York, for the sale by the former to the latter of about 30,000 Shantung weasel skins. It was provided in the contract: "Shipments from China per steamer *direct or indirect* to New York during March and/or April. Price: $2.45 each *c.i.f. New York*. Import duty, if any, to be paid by the buyer. Payment: Four m/s confirmed banker's letter of credit $73,500 to be opened by the buyer in favor of and to be approved by the seller. * * * In case of a c.i.f sale and the goods are damaged while in transit, the buyer agrees to accept in settlement thereof the same percentage of allowance as the seller may secure from the insurers by way of settlement of recovery." The sellers (plaintiffs) never shipped any weasel skins under the contract, but on June 25 obtained in New York 10,000 skins of the kind contracted for and tendered them to the buyers, who refused them. The sellers then commenced the action for damages, alleging in their complaint as a breach of the contract the refusal of the buyers to accept the skins tendered, and their refusal to accept any skins so obtained in New York, and also alleging that the skins tendered had been shipped from China (though not by them) to New York, via Seattle, and that they "would and could have obtained and delivered to defendants" the remaining skins "within the

reasonable time for delivery in New York of March or April shipments by steamer from China," and further alleging that the skins actually tendered "were insured in the amount and against the risks usual in an ordinary c.i.f. contract under a policy payable to the plaintiffs." To the complaint the buyers (defendants) demurred on the ground that it did not state facts sufficient to constitute a cause of action. The demurrer was sustained in the trial court and defendants had judgment, which judgment was affirmed by the U. S. Circuit Court of Appeals for the Second Circuit. The court, after making the statements quoted earlier in this opinion, further said (278 Fed. 104):

"This question of construction is one of general law, if not general commercial law, and unaffected by any statute of New York, especially the Sales of Goods Act * * * even assuming that the place of execution of agreement furnishes the law of the contract. That the Sales Act left c.i.f. contracts 'as before' was specifically held in *Smith Co. v. Moscahlades,* 193 N. Y. App. Div. 126, 183 N. Y. Supp. 500.

"We are thus required to construe or interpret a commercial or mercantile agreement partly written and partly printed, wherein at the very beginning it is written that the price is to be 'c.i.f. New York,' and the shipment from China; but later follow printed words plainly implying that the seller is not only to procure insurance, but collect from the insurers, and therefore suggesting that such insurance would naturally be in the seller's name. It is urged that this latter proviso is so repugnant to the nature of a c.i.f. contract as to transform it into something else, and justify a tender of goods in New York, instead of a delivery of documents by mailing in China.

"It cannot be doubted that it is only when parts of a written agreement are so radically repugnant that 'there is no rational interpretation that will render them effective and accordant that any part must perish.' (*Rushing v. Manhattan Life Ins. Co.,* 224 Fed. 74, 139 C. C. A. 520.) * * *

"But a dependence upon rules, which, detached from the circumstances surrounding and justifying their formulation, often seem arbitrary, is unsatisfactory; every rule should be one of reason. Here the first and reasonable inquiry is: What is the dominant or leading thought revealed by this writing, read with the eye of experience? Plainly that seller was to ship the furs and send the documents ahead by mail, so that buyer could, if he wanted, sell the goods again 'to arrive.' That is a c.i.f. contract. Therefore the parties intended to make that sort of agreement, and the 'rules' are resorted to to effect their intent.

"This is the fundamental guide in construction; it is well put (with an extreme application thereof) in *Morrill & Whiton Const. Co. v. Boston,* 186 Mass. 217, by saying that, where 'a repugnancy is found between clauses, the one which essentially requires something to be.done to effect the general purpose of the contract itself is entitled to greater consideration than the other which tends to defeat a full performance; and the repugnant words may be rejected in favor of a construction which makes effectual the evident purpose of the entire instrument.'

"The evident purpose of this agreement was to give the buyer substantially what a c.i.f. sale would have given him; the seller never even attempted to put the buyer in that desired and agreed upon position, and the decision below was right, because the contract was of the kind known as c.i.f. Judgment affirmed, with costs."

In the light of these rules of construction, we do not think, as to the contract in the present case, that there is any inconsistency or repugnancy between its provision "C.I.F. Havana" and its provision: "Payment: On arrival and inspection of the goods." The case of *Orient Co., Ltd. v. Brekke & Howlid, supra,* is in point, wherein the plaintiffs contracted with the defendants for the sale of 20 cases of French walnuts, "c.i.f. to Hull," payment to be made 30 days after arrival. The clauses in that contract and in the contract in the present case are substantially the same.

In both the goods were sold on "c.i.f." terms.  In the *Orient Co.* case the buyer had the right to inspect before payment, because payment was not to be made until 30 days after the goods had arrived.  In the present case, payment was to be made on "arrival *and* inspection" of the goods.  In both the buyer had the right to inspect before payment.  In the *Orient Co.* case it was held that the seller could not recover because, as in the present case, no insurance policy on the goods contracted for was tendered with the documents and, hence, there had not been a delivery of the goods in accordance with the "c.i.f." contract.  The case of *Arnhold Karberg & Co. v. Blythe, Green, Jourdain & Co., supra,* is also in point, where there was sold on "c.i.f." terms, as stated in the judgment of the trial judge, "a quantity of grain, with a liberty to vary it within limits, to be shipped at a time specified, and place specified, at a price specified, with allowance for foreign substances to be ascertained at the port of discharge."  The contract was construed to be a "c.i.f." contract, notwithstanding the fact that the quantity sold could not be ascertained until the goods had been inspected for foreign substances at said port.

Plaintiff's counsel makes the further contention in substance that, the time of payment being fixed, "on arrival and inspection of the goods," inspection and acceptance of the rice by defendant was a condition precedent to the passing of the title to the rice.  The real question for determination in the present case, as we see it, is, whether, under the "c.i.f." contract sued upon, defendant under the facts in evidence and under the law was justified in its refusal to accept the tendered documents and the goods.  If defendant was so justified, and we think it was, plaintiff cannot recover any sum as damages in this action.  And we do not think that a discussion of counsel's last-mentioned contention is material or necessary for a determination of the issues involved.

Various other points are urged by counsel for defendant as grounds for a reversal of the judgment. They relate mainly to the excessive amount of the verdict and to certain rulings of the trial court, claimed to be erroneous, but, in view of our holdings, a discussion of them is unnecessary.

Our conclusion is that the judgment of the municipal court should be reversed, and it is so ordered.

*Reversed with finding of facts.*

FITCH and BARNES, JJ., concur.

Finding of facts. We find as ultimate facts in this case that the plaintiff, Liberty Export & Import Corporation, did not at any time tender to defendant, Swift & Company, the documents required to be tendered, by virtue of the "c.i.f." contract in question and under the law relating to such contracts, viz.: a bill of lading, an insurance policy and a consular invoice for the 100 tons of rice in question, or any or either of them.